**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEFFREY BARHAM, *et al.*,　　　　)
　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　)　　　Civ. Action No. 02-2283 (EGS)
　　　　　　　　　　　　　　　)
CHARLES H. RAMSEY, *et al.*,　　)
　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　)
_____)
JULIE ABBATE, *et al.*,　　　　　)
　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　)　　　Civ. Action No. 03-767 (EGS)
　　　　　　　　　　　　　　　)
CHARLES H. RAMSEY, *et al.*,　　)
　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　)

**MEMORANDUM OPINION**

**I. INTRODUCTION**

These related cases arise from events on September 27, 2002,
when approximately 3000 to 5000 people joined in demonstrations
in the District of Columbia protesting the policies of the World
Bank, the International Monetary Fund ("IMF"), and the United
States government.  Plaintiffs in Civil Action 02-2283 ("Barham
plaintiffs") and Civil Action 03-767 ("Abbate plaintiffs") were
among the approximately 400 people arrested at or near a
demonstration taking place in General John Pershing Park
("Pershing Park"), located on Pennsylvania Avenue N.W. between

14th and 15th Streets N.W..  Plaintiffs allege that their arrests and subsequent detentions violate clearly established constitutional rights, including the right to "be free from the unreasonable seizure of one's person and to be free from government disruption of, interference with, or retaliation for, engagement in free speech, assembly, petition and free press activities."  Pls.' Opp. to Ramsey and Williams Mot. to Dismiss in 02-2283 at 7; Pls.' Opp. to Newsham Mot. to Dismiss in 02-2283 at 4; Am. Compl. in 03-767 ¶ 4 (stating that plaintiffs "bring this action under 42 U.S.C. § 1983 and the common law to vindicate their civil rights, including the right to be free from the unreasonable seizure of their persons or deprivation of liberty or property without due process of law and to exercise their First Amendment rights of free speech and assembly").  Plaintiffs pursue these claims against various named and unnamed District of Columbia and United States officials in both their individual and official capacities.[1]   Three of the named

---

[1] The Abbate plaintiffs name Chief of the District of Columbia Metropolitan Police Department ("MPD") Charles H. Ramsey, Assistant Chief of the MPD Peter J. Newsham, and the District of Columbia as defendants.  The Barham plaintiffs name Chief Ramsey, Assistant Chief Newsham, District of Columbia Mayor Anthony Williams, the District of Columbia, the District of Columbia Metropolitan Police Department, U.S. Secretary of the Interior Gale Norton, Attorney General John Ashcroft, the United States of America, and unidentified officers, supervisors and law enforcement agencies as defendants.

defendants, Chief of the District of Columbia Metropolitan Police Department ("MPD") Charles H. Ramsey, Assistant Chief of the MPD Peter J. Newsham, and Mayor of the District of Columbia Anthony Williams, assert that they enjoy qualified immunity from personal liability, and move the Court to dismiss the claims as they pertain to defendants personally.

Pending before the Court in Civil Action 02-2283 are Defendant Newsham's Motion to Dismiss or in the Alternative for Summary Judgment, and Defendants Williams's and Ramsey's Motion for Summary Judgment on Claims Pertaining to Qualified Immunity. Pending before the Court in Civil Action 03-767 are Defendant Newsham's Motion to Dismiss the Complaint or in the Alternative for Summary Judgment and Defendant Ramsey's Motion for Summary Judgment Pertaining to Qualified Immunity Issues.  Upon careful consideration of the motions, the responses and replies thereto, all supplemental briefing, the extensive oral arguments of counsel, as well as the governing statutory and case law, and for the following reasons, it is by the Court hereby ordered that Defendant Newsham's Motion to Dismiss or in the Alternative for Summary Judgment in Civil Action 02-2283 is **DENIED;** Defendants Williams's and Ramsey's Motion for Summary Judgment on Claims Pertaining to Qualified Immunity in Civil Action 02-2283 is **GRANTED** as to Defendant Williams and **GRANTED IN PART AND DENIED**

**IN PART** as to Defendant Ramsey; Defendant Newsham's Motion to
Dismiss the Complaint or in the Alternative for Summary Judgment
in Civil Action 03-767 is **DENIED**; and Defendant Ramsey's Motion
for Summary Judgment Pertaining to Qualified Immunity Issues in
Civil Action 03-767 is **GRANTED IN PART AND DENIED IN PART**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The IMF and World Bank annually conduct meetings in
Washington D.C; these meetings historically draw small, peaceful
protests.  Over the past several years, however, the protests
have grown in size, as has the number of protest-related arrests.
Over an eight-day period in April 2000, more than 1000 people
were arrested in Washington D.C. during protests related to the
2000 IMF/World Bank Meetings.  Protests in 2001 were minimal, and
no arrests were made, as the meetings were canceled following the
events of September 11, 2001.

The MPD believed that the 2002 meetings were likely to draw
large, potentially violent and destructive protests, largely
because recent anti-globalization protests in Seattle had seen
acts of violence and breaches of the peace.  *See* Newsham Mot. to
Dismiss in 02-2283 at 5.  Prior to the scheduled September 2002
Meetings, the MPD Civil Disturbance Unit ("CDU") members received
training in preparation for the expected protests.  Chief Ramsey

4

was in overall command of MPD's operation plan and handling of
the expected parades and demonstrations.   Four Assistant Chiefs
were charged with responsibility for specific areas of the city;
Assistant Chief Newsham was responsible for the zone encompassing
Pershing Park.   In addition, MPD developed  "post and forfeit"
and "citation release" options for people arrested for
misdemeanors; these procedures would allow arrestees to post and
forfeit collateral and then be released without having to await
arraignment in detention.   The plan allowed for arrestees to be
processed at three centers within the District.  Ramsey and
Williams Statement of Material Facts in 02-2283 ¶¶ 42-45; Ramsey
Statement of Material Facts in 03-767 ¶¶ 42-45.

On the day of the protests, Chief Ramsey heard via police
radio that "significant activity" was taking place in Pershing
Park, and thus proceeded to Pershing Park.  When he arrived,
Assistant Chief Newsham advised him that the people in Pershing
Park would be arrested based on his personal observation and
reports from MPD subordinates that the people in the Park had
engaged in unlawful acts *prior* to congregating in the Park,
including refusing MPD officers' commands to move from the
roadway, and knocking over trash receptacles and newspaper
vending machines.  Williams and Ramsey Statement of Material
Facts in 02-2283 ¶ 32; Ramsey Statement of Material Facts in 03-

767 ¶ 32.   Assistant Chief Newsham asserts that he walked around the perimeter of the park for 45 minutes, and observed that some protestors were wearing masks and taunting police officers. Newsham Statement of Material Facts in 02-2283 ¶¶ 46-47;  Newsham Statement of Material Facts in 03-767 ¶¶ 46-47.  Assistant Chief Newsham gave the order for the mass arrest, "correctly believing that, based on what he advised Chief Ramsey in their conversation, Chief Ramsey tacitly approved . . . Newsham's decision."  Williams and Ramsey Statement of Material Facts in 02-2283 ¶ 38; *see also* Newsham Statement of Material Facts in 03-767 ¶ 49.

As admitted during oral argument at the April 6, 2004, Motions Hearing, it is undisputed that Assistant Chief Newsham did not give an order to disperse prior to effectuating the mass arrest.  April 6, 2004, Motions Hearing Transcript ("Tr.") at 6 (defense counsel for Ramsey and Williams confirming that no notice to disperse was given); *see also* Newsham Statement of Material Facts in 03-767 ¶ 54 (stating "Assistant Chief Newsham did not give orders for the demonstrators to clear the Park"). The Park was cordoned off on all sides by 10:15 a.m., and all of the people in the Park were arrested.  Newsham Statement of Material Facts in 03-767 ¶ 53.

On the same day, a large number of people were also arrested at or near Vermont Avenue and K Street, N.W.. Assistant Chief Brian Jordan, who was responsible for the area during the protests, ordered a mass arrest. Williams and Ramsey Statement of Material Facts in 02-2283 ¶ 53. Assistant Chief Jordan asserts that, after observing protestors "ignoring vehicular traffic," he determined that "in order to ensure the public's safety, the only recourse was to effect the arrests of all protestors who were marching illegally." Jordan Decl. ¶¶ 4,5.

It is undisputed that, despite the planned availability of expedited citation release, there were lengthy delays in prisoner processing. MPD attributes these delays to information technology malfunctions and operational adjustments, including the Information Technology ("IT") system falling non-operational until the evening of September 27, 2002; incompatibility problems with cameras used to photograph arrestees and computer software; and previously scheduled deactivation of the Criminal Justice Information System (CJIS). Williams and Ramsey Statement of Material Facts in 02-2283 ¶¶ 46-50; Ramsey Statement of Material Facts in 03-767 ¶¶ 46-50. While in transit and while being held, arrestees were restrained by "flexi-cuffs," which are "plastic bands that operate much like small belts." Williams and Ramsey Statement of Material Facts

in 02-2283 ¶¶ 55-57.   Some arrestees, specifically the 200
arrestees who were detained at the MPD's Institute for Police
Science gymnasium ("IPS"), were restrained by a series of three
flexi-cuffs, which attached an individual's wrist to her
opposite ankle and left the arrestee in a seated position.
Williams and Ramsey Statement of Material Facts in 02-2283 ¶ 50.

MPD After-Action Reports concluded that there were
"deficiencies in the Department's handling of aspects of the
September 27, 2002 events."  *Id.* ¶ 58.  The MPD also concluded
that "the park had not been cleared of all persons before the
persons who had been observed to have engaged in criminal
misconduct entered the park.  Nor had an order been given
advising all persons within the park to disperse."  *Id.* ¶ 60;
Ramsey Statement of Material Facts in 03-767 ¶ 58.  Chief Ramsey
ultimately issued an official reprimand to Assistant Chief
Newsham for the failure to give warnings to disperse before
conducting the mass arrests.  *Id.* ¶¶ 60-61; Ramsey Statement of
Material Facts in 03-767 ¶¶ 58-59.

Plaintiffs' claims in both actions flow from these mass
arrests and subsequent detention.  The heart of their "trap and
arrest" charge is that police cordoned off the Pershing Park
area,[2] essentially "trapping" the protestors within the Park, and

---

[2] The arrests at Vermont and K Street are addressed *infra.*

then initiated a mass arrest without first warning the protestors
that they must disperse to avoid arrest.  Plaintiffs argue that
these arrests, the resulting detention, and the use of
restraining force, violate clearly established constitutional
protections, and allege that Mayor Williams, Chief Ramsey, and
Assistant Chief Newsham should be held liable in both their
official and personal capacities for the constitutional injuries.
The three defendants argue that principles of qualified immunity
shield them from any personal liability.  Thus, the question
currently before the Court is not whether plaintiffs prevail on
their underlying claims, but rather whether any or all of the
defendants could face personal liability if plaintiffs do
eventually prevail on their claims.

## III.   STANDARD OF REVIEW

In appraising the sufficiency of a complaint, a court must
follow "the accepted rule that a complaint should not be
dismissed unless it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief."  *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see
also Swierkiewicz v. Sorema,* 534 U.S. 506, 514 (2002) (stating
that a court may dismiss a complaint "only if it is clear that no
relief could be granted under any set of facts that could be

proved consistent with the allegations")(quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  For purposes of a motion to dismiss, a court must treat the plaintiff's factual allegations as true, and must liberally construe the complaint in favor of the plaintiff.  *See, e.g., Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Jenkins v. McKeithen,* 395 U.S. 411, 421-422 (1969).

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56*; Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  As with the Court's review of a motion to dismiss, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, when the moving party has carried its burden, the non-movant must raise more than "some metaphysical doubt as to the material facts;" simply stated, only a *genuine* issue of fact will suffice to defeat a motion for summary judgment.  *Id*. at 586.

## IV.  QUALIFIED IMMUNITY STANDARD

"Qualified immunity shields officials from liability for damages so long as their actions were objectively reasonable, as measured in the light of the legal rules that were 'clearly established' at the time of their actions." *Lederman v. United States*, 291 F.3d 36, 46 (D.C. Cir. 2002); *see also Butera v. District of Columbia*, 235 F.3d 637, 646-47 (D.C. Cir. 2001). Once a qualified immunity defense is raised, the question becomes whether the government official asserting qualified immunity "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).  In order for an immunity defense to be defeated, "the contours of the right [must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Thus, the qualified immunity analysis is essentially a two step inquiry: (1) whether a constitutional violation has occurred, and (2) whether the violated right was "clearly established" at the time of the alleged violation.  *Saucier v.*

*Katz*, 533 U.S. 194, 200 (2001); *International Action Center v. United States*, 365 F.3d 20, 25 (D.C. Cir. 2004).  The question of whether a right is "clearly established" involves an analysis of "whether the Supreme Court, the District of Columbia Circuit, and, to the extent that there is a consensus, other circuits have spoken clearly on the lawfulness of the conduct at issue." *Butera*, 235 F.3d at 652.  If it would "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," the right is considered clearly established.  *Groh v. Ramirez*, 124 S.Ct 1284, 1293 (2004) (quoting *Saucier*, 533 U.S. at 202); *see also Butera,* 235 F.3d at 646 (the constitutional right must be established "at the appropriate level of specificity").

Finally, the Court must determine whether the defendant's actions were objectively reasonable in light of the clearly established law.  It is no defense that an official was unaware of a law, as a "reasonably competent public official should know the law governing his conduct."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982).  Thus, "a police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful."  *District of Columbia v. Indiana Evans*, 644 A.2d 1008, 1025 (D.C. 1994).

V.   **ANALYSIS**

   **A. Immunity for Arrests in Pershing Park in Civil Action 02-2283 and Civil Action 03-767**

   Plaintiffs argue that the type of arrest at issue--that is, a mass arrest made without a previous order to disperse--has been clearly established as unconstitutional and unlawful. Specifically, plaintiffs argue that *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), establishes the clear contours and guidelines pertaining to a police officer's authority to order a mass arrest.

   *Dellums* arose on facts remarkably similar to the present litigation.  There, Vietnam War protestors were arrested at the foot of the Capitol steps; the area was cordoned off by police, all assembled were prevented from leaving, and mass arrests ensued.  *Dellums* focused on the police chief's immunity claim; specifically, "whether Chief Powell acted in good faith in arresting plaintiffs and whether his actions were reasonable in light of all the circumstances."  *Dellums*, 566 F.2d at 176. Upholding a jury verdict finding Chief Powell personally liable for First and Fourth Amendment constitutional violations, the Court noted it was the Chief's burden to show that "he had an honest belief that the plaintiffs *as a group* were violating the

law by assembling at the Capitol, and further, that this belief

was reasonable in light of the facts available to him at the

scene of the arrests and the law as it then existed." *Id.* at 177

(emphasis in original).   The Court concluded that

> plaintiffs could not constitutionally have been
> arrested as a group . . . unless Chief Powell had
> reason to believe: (1) that the plaintiffs comprised
> one of the groups that could be banned or ordered from
> the Capitol under *Nicholson*; (2) *that orders to
> disperse had been given which apprised the crowd as a
> whole that it was under an obligation to leave; and (3)
> that a reasonable opportunity had been given the
> plaintiffs to leave the Capitol.* This conclusion . . .
> in our judgment represents well settled law which Chief
> Powell was obliged to know on pain of losing his
> qualified immunity.

*Id.* at 183 (emphasis added).

The Court agrees that *Dellums* establishes the contours of

constitutional protections in mass arrest cases.   While

defendants urge a reliance on *Washington Mobilization Committee

v. Cullinane*, the Court notes that *Dellums* and *Cullinane* are not

inconsistent.   While *Cullinane* stands for the proposition that

police officers do not have a duty to single out individuals for

arrest if a protest as a whole has turned violent*,* the Court,

consistent with *Dellums*, made clear that

> We do not suggest of course that one who has *violated
> no law* may be arrested for the offenses of those who
> have been violent or obstructive. As we have seen .
> . . the police may validly order violent or
> obstructive demonstrators to disperse or clear the

streets.  If any demonstrator or bystander refuses to obey such an order *after fair notice and opportunity to comply*, his arrest does not violate the Constitution even though he has not previously been violent or obstructive.

*Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (emphasis added).

  1. *Assistant Chief Newsham's Immunity Claims for Pershing Park Arrests in Civil Action 02-2283 and Civil Action 03-767*[3]

Assistant Chief Newsham asserts that the mass arrest on September 27, 2002, was lawful and, even assuming *arguendo* that the arrest was unconstitutional under *Dellums* and its progeny, he acted reasonably in ordering the mass arrest.  Specifically, Assistant Chief Newsham argues that notwithstanding his failure to give an order to disperse prior to effectuating arrests, there was independent probable cause to arrest the protestors because (1) they had broken the law *prior* to entering the Park, (2) the protestors' presence in the Park was unlawful, and (3) he feared

_____

[3] Assistant Chief Newsham's motions to dismiss or for summary judgment on qualified immunity grounds in Civil Actions 02-2283 and 03-767 focus solely on the mass arrest at Pershing Park.  Accordingly, the Court understands the Assistant Chief to be asserting qualified immunity only as plaintiffs' claims dealing directly with the Pershing Park arrests.  *See* Newsham Mot. to Dismiss in 03-767 at 2 ("Assistant Chief Newsham ordered the arrest at Pershing Park, but he had no involvement nor responsibility or control over the circumstances under which plaintiffs were detained after they were arrested . . .thus, this motion addresses only those portions of the Amended Complaint which pertain to Assitant Chief Newsham.").

the protestors would engage in violence if they were permitted to leave the Park.

Despite the fact that the official charge levied against the plaintiffs was "failure to obey," Assistant Chief Newsham argues that the asserted probable cause to arrest plaintiffs was not based on plaintiffs' refusal to obey a dispersal order, but rather was established by his knowledge of the protestors' *prior* unlawful activity.  Specifically, Newsham states that he was aware, through personal observation and other officers' reports, that

1.    no parade permits had been issued, and thus any street demonstrations were *per se* unlawful;
2.    demonstrators were disregarding officers' instructions to move from the street to the sidewalks;
3.    demonstrators were marching in the streets and impeding traffic;
4.    demonstrators had knocked over trash containers and newspaper vending machines, and that at least one window had been smashed; and
5.    demonstrators had engaged in a "Sleeping Dragon" protest maneuver, where they had chained themselves together so police could not remove them individually.

Newsham Statement of Material Facts in 03-767 ¶¶ 37-43.

Assistant Chief Newsham argues that this alleged illegal activity, coupled with his knowledge that MPD had received intelligence information that groups of protestors had declared an intention to "shut down the city," established independent

probable cause for arrest.  Newsham Mot. in 03-767 at 15.

Finally, Assistant Chief Newsham states he believed the

demonstrators "were continuing to act as an organized group and

would at some point leave the park to continue their unlawful

demonstrations in the streets."  Newsham Statement of Material

Facts in 02-2283 ¶ 48.  Newsham argues he

> believed that if the demonstrators were allowed to
> leave Pershing Park, they would continue their
> unlawful, destructive behavior, and if they did so,
> particularly in a major traffic artery or if they
> approached the vicinity of the White House, MPD
> Officers would be required to make arrests of roving
> bands of demonstrators in the streets, thus increasing
> the likelihood of violence and injury to the police, to
> demonstrators and to passerby.

*Id.* ¶ 50.  Assistant Chief Newsham concludes that because he had

probable cause to believe the protestors had already committed

unlawful acts, and because the decision to order the mass arrest

in Pershing Park was also an attempt to prevent possible future

violence, he was under no obligation to issue a warning to

disperse and allow the protestors an opportunity to do so before

ordering the mass arrest.  Accordingly, Assistant Chief Newsham

asserts that he is immune from any personal liability for the

mass arrest.

    The Court is not persuaded by Assistant Chief Newsham's

arguments.  As an initial matter, the Court notes that the

arrested protestors were charged with "failure to obey."  Not a

single arrestee was charged with any of the offenses that
Assistant Chief Newsham avers established the probable cause to
lawfully effect the mass arrest.  Tr. 4/6/04 at 79 (Newsham's
counsel admitting none of the plaintiffs were criminally charged
for any activity prior to entering the Park); *Id*. at 85
(Newsham's counsel stating the protestors "were not doing
anything illegal in the Park in and of itself").  Indeed,
Assistant Chief Newsham expressly admits he was unable to
identify specific people who had allegedly committed this
criminal conduct, but could only identify "groups" of people.
*Id*. at 86 (Newsham's counsel agreeing with the Court that
Newsham "could not identify any individuals in that group as
being individuals whom he had observed committing criminal
activity before they arrived at Pershing Park").  It is thus not
even clear that these prior violations actually occurred, or
would have formed the basis for arrest.  Moreover, given that
defendants concede that an order to disperse was not given, the
"failure to obey" charge is nothing short of ludicrous: the
arrest for "failure to obey" was clearly made without probable
cause, or factual predicate, as there simply was no order to
"obey."

It is thus clear that there was not a legitimate basis to
arrest each individual in Pershing Park.  Assistant Chief

Newsham's belief that *some* protestors *may* have earlier broken

laws does not justify a mass arrest of an entire group of lawful

protestors, as a

> person's mere propinquity to others independently
> suspected of criminal activity does not, without
> more, give rise to probable cause [as to that person]
> . . . seizure of a person must be supported by
> probable cause particularized with respect to that
> person. This requirement cannot be undercut or
> avoided by simply pointing to the fact that
> coincidentally there exists probable cause to search
> or seize another or to search the premises where the
> person may happen to be.

*Maryland v. Pringle*, 124 S.Ct. 795, 801 (2003) (internal

citation and quotation omitted).[4]   As plaintiffs aptly state,

*Dellums* establishes a "bright line rule" that "where a group

contains persons who have not been violent or obstructive,

police may not mass arrest the demonstration as a group without

fair warning or notice and the opportunity to come into

compliance and disperse."  Pls.' Opp. to Ramsey and Williams

Mot. to Dismiss in 02-2283 at 10.  It is undisputed that no

order to disperse was given before the Park was cordoned off and

the mass arrest initiated.  This failure to give the

protestors--who were essentially trapped in the Park--fair

---

[4] The Supreme Court did find that probable cause existed in
*Pringle*, but was careful to distinguish that case from a long-
line of cases foreclosing probable cause based on guilt by
association.

warning and an actual chance to disperse is fatal.  *See* Tr.
4/6/04 at 18 (Chief Ramsey's counsel agreeing with the Court
that protestors could not leave the Park, as there was "no way
to get out of [the] cordoned off area").

The *Dellums* Court found the police chief's failure to make
sure his dispersal orders were *actually heard*, not merely given,
rendered the mass arrest illegal.  *Dellums,* 566 F.2d at 183.
Here, it is uncontroverted that Assistant Chief Newsham didn't
even *attempt* to give a dispersal order, thus rendering the
arrests in flat conflict with the clearly established parameters
of *Dellums*.  It is not the arrests *per se*, but his failure to
give an order reasonably calculated to give notice of the need
to disperse before ordering the arrests, that renders the
arrests constitutionally infirm.[5]

Thus, it is clear that the mass arrest in Pershing Park ran

---

[5] Assistant Chief Newsham's statement that he "believed that any
individuals in the Park who were not part of the unlawful
demonstration had ample opportunity to leave and had done so"
does not cure his failure to give a dispersal order, and is
belied by the facts that (1) the Park was cordoned off, thus
making exit impossible, and (2) the MPD's after-action report
found that individuals who were *not* part of the demonstration
were indeed arrested.  Newsham Statement of Material Facts in 02-
2283 ¶ 55.  "[T]he 'fair notice' required . . . is notice
reasonably *likely to have reached all of the crowd*."  *Dellums*,
566 F.2d at 181 n. 31 (emphasis added).  Clearly, Assistant Chief
Newsham's "belief" that the crowd could have dispersed, without
actually giving a warning to disperse, did not put the crowd,
including mere bystanders, on notice of any need to disperse.

afoul of the First and Fourth Amendment constitutional protections established in *Dellums.*  Proceeding to the next step of the qualified immunity inquiry, the Court concludes that Assistant Chief Newsham is not shielded by a veil of qualified immunity for this constitutional violation.  In light of clearly established law predicated on almost identical factual circumstances, his actions cannot be considered those of a reasonable police officer.

First, the binding authority in this Circuit, coupled with MPD Guidelines, defines the law at issue as "clearly established," and charges Assistant Chief Newsham with notice of, and adherence to, that law.  In light of *Dellums*, no "reasonable officer could claim to be unaware" of the need to give a warning to disperse before arresting a crowd of lawful protestors.  *Groh*, 124 S.Ct at 1294.  The situation Assistant Chief Newsham encountered in Pershing Park falls squarely into the *Dellums* scenario: when faced with a crowd of demonstrators who were not as a whole violent or destructive, police officers must provide the crowd with a notice to disperse before commencing a mass arrest.  *Dellums*, 566 F.2d at 183.  There simply isn't any ambiguity as to the established law.

Moreover, the MPD Manual for Mass Demonstrations requires several stages of warnings before a mass arrest order can be

given, and clearly states that mass arrest is authorized only

> if, after a reasonable amount of time following the
> *initial warnings*, the crowd refuses to disperse, the
> unit commander . . . enter[s] a *final warning* ordering
> the participators to disperse or be subject to arrest
> . . . if after a reasonable amount of time following
> the *final warning*, the crowd continues in its refusal
> to disperse, the unit commander shall direct that the
> violators be arrested.

MPD Manual on Mass Demonstrations at 21 (emphasis added); *see also* Newsham Statement of Material Facts in 02-2283 ¶ 36 (admitting knowledge of Chief Ramsey's instructions that demonstrators should be accommodated and minor violations of the law would be permitted in order to facilitate First Amendment expression); *Groh*, 124 S.Ct at 1294 (department guidelines can place defendant on notice of potential personal liability).

Finally, it is most significant that other officials on the scene, witnessing the same events and applying the same clearly settled law, decided that a mass arrest was *not* warranted. For example, the United States Park Police, who have the authority to issue demonstration permits in the Park, refused to arrest anyone for demonstrating without a permit. *See* Major Richard Murphy Decl. ¶ 44 ("I explained [to Newsham] . . . that while no group had a Park Service permit for the Park, that the Park Police would make no arrests, explaining that . . . *our Park Police procedure was to first warn individuals that they were in*

*violation and allow them to come into voluntary compliance*.")
(emphasis added).  CDU Coordinator Lieutenant Jeffrey Herold
also advised command officials on the scene at Pershing Park
that they should *not* effectuate a mass arrest because he "could
not see how they established probable cause," and also
recommended alternatives to mass arrest.  *See* Herold Depo. at
333-34, 335.  Thus, any argument that other officers in the same
position would have also ordered the mass arrest falls flat, as
other officers actually on the scene concluded that ordering a
mass arrest without first giving an order to disperse was not
lawful.

Here, as noted above, individualized probable cause to
arrest each individual was not established, as Assistant Chief
Newsham did not witness each arrestee commit an arrestable
offense.  Absent a dispersal order and an opportunity to
disperse, a mass arrest of lawful protestors without a prior
dispersal order is constitutionally infirm.[6]

Assistant Chief Newsham's order for a mass arrest made

_____

[6] Moreover, Assistant Chief Newsham's assertion that the gathering
in Pershing Park was *per se* illegal because the protestors were
there without a permit is belied by Newsham's counsel's express
statement that the protestors "were not doing anything illegal in
the Park in and of itself."  Tr. 4/6/04 at 85.  Thus, even if the
crowd was demonstrating without a permit, Newsham had an
obligation to give a dispersal warning and order before
commencing the mass arrests.

without a previous order to disperse violated clearly

established law and was not objectively reasonable.

Accordingly, his claim of qualified immunity as to personal

liability for the Pershing Park arrests is denied.

    2. *Chief Ramsey's Immunity Claims for Arrests in Pershing
      Park in Civil Action 02-2283 and Civil Action 03-767*

For the reasons stated *supra*, the Court finds the mass

arrest in Pershing Park ran afoul of the clearly established

constitutional protections enunciated in *Dellums.*  Indeed,

during the April 6, 2004, Motions Hearing, Chief Ramsey's

counsel admitted that the arrests could not be justified as

constitutional, and that a dispersal order should have been

given.  *See* Tr. 4/6/04 at 24.  Thus, as essentially conceded by

Chief Ramsey, the only question as to Chief Ramsey's possible

personal liability for the mass arrest is whether he acted in an

objectively reasonable manner.  The crux of Chief Ramsey's

argument is that his approval of the mass arrest was reasonable

because he was unaware that an order to disperse had not been

given prior to the commencement of arrests.

    Plaintiffs argue that because Chief Ramsey was on the scene

prior to the arrests, and conferring with Assistant Chief

Newsham, Chief Ramsey participated in and approved the mass

arrest conducted in clear violation of *Dellums*, and thus can be

held personally liable for the resultant constitutional violations.   Indeed, Chief Ramsey candidly admits that he arrived at Pershing Park *before* the arrests began.   "By the time that Chief Ramsey . . . arrived, Newsham had already decided to arrest the persons who had collected in Pershing Park . . . Newsham was awaiting the arrival of buses to transport those individuals to arrest processing sites once the arrests had been effected before he directed the arrest process to be commenced." Ramsey Mot. for Summ. J. in 03-767 at 7.   Ramsey also states that he "believed, based upon the conversation that he . . . had with Newsham, that probable cause existed to support the arrests of the persons in Pershing Park."   Ramsey Statement of Material Facts in 03-767 ¶ 38.   He further admits that "Newsham ordered the arrests of the persons in Pershing Park, *correctly believing that, based upon what he advised Chief Ramsey in their conversation, Chief Ramsey tacitly approved Newsham's decision.* Based on information that Chief Ramsey had received, *Chief Ramsey did not countermand Newsham's decision and order*." Williams and Ramsey Statement of Material Facts in 02-2283 ¶ 38 (emphasis added).   It is thus clear that Chief Ramsey approved the arrests before they occurred.

If Chief Ramsey knew that a dispersal order had not been given, his immunity defense obviously fails for the same reasons

articulated in the discussion of Assistant Chief Newsham's
immunity.  It is unclear, however, whether Chief Ramsey was
aware that the crowd had not been ordered to disperse.  Chief
Ramsey's original sworn statement claims that when he arrived at
the Park, Assistant Chief Newsham "explained . . . he believed
that he had probable cause to arrest persons who had entered the
Park at the time they arrived in the park, based on offenses
they had committed before entering Pershing Park, *without
ordering them to disperse and awaiting their response*."  Ramsey
Decl. 10/13/03 ¶¶ 17-19 (emphasis added).  However, Chief Ramsey
also claims that he "did not realize, at that point, that the
park had not, in fact, been cleared of people before it came to
be a holding area . . . *or that orders to disperse had not been
given to the crowd*."  Williams and Ramsey Statement of Material
Facts in 02-2283 ¶ 39 (emphasis added).  During oral argument,
counsel stated that Chief Ramsey was not aware of the failure to
give an order to disperse.  Thus, the existence of this factual
dispute on such a central issue--Ramsey's knowledge or lack
thereof that a dispersal order had not been given--could itself
preclude summary judgment on the qualified immunity issue.

Moreover, even assuming *arguendo* that Chief Ramsey was
unaware that a dispersal order had not been given prior to the
arrest, this simply begs the question of why Chief Ramsey did

not ask whether the order had been given prior to approving the
arrest.  Chief Ramsey fully admits he had an opportunity to
confer with Assistant Chief Newsham prior to the arrest, and
only after this conferral did he approve the mass arrest.  *See*
Tr. 4/6/04 at 9 (Ramsey's counsel stating "there was a
consultation between Assistant Chief Newsham and the Chief in
which the decision to arrest was, in fact, approved").  It is
quite clear to the Court that a *reasonable* police chief, coming
upon the scene of 400 people exercising their First Amendment
rights to engage in protest activities and not currently
engaging in any illegal behavior, would recognize the need--and
indeed *the duty*--to ask a subordinate officer whether a
dispersal order had been given prior to ratifying a mass arrest.
*See* Tr. 4/6/04 at 20-21 (Ramsey's counsel stating "nothing has
been suggested . . . that criminal conduct arising in an arrest"
was taking place in Pershing Park when Chief Ramsey arrived).
A police officer, and especially a seasoned police chief in the
Nation's Capital, has a duty to pursue "reasonable avenues of
investigation" before interfering with the exercise of First
Amendment freedoms, "especially when . . . it is unclear whether
a crime had even taken place."  *Be Vier v. Hucal*, 806 F.2d 123,
127 (7th Cir. 1986)(denying qualified immunity where police
officer had failed to make reasonable inquiries before making

arrest).  Given the admitted dearth of illegal activity
occurring in the Park, Chief Ramsey had a duty to inquire as to
the circumstances surrounding and justifying the mass arrest.

Chief Ramsey's reliance on Assistant Chief Newsham's on-
scene report does not excuse Chief Ramsey's approval of unlawful
arrests, and does not rise to the level of investigation that
the Pershing Park situation warranted.

> Although a police officer is entitled to rely on
> information obtained from fellow law enforcement
> officers . . . *this in no way negates a police
> officer's duty to reasonably inquire or investigate
> these reported facts.*  We have denied qualified
> immunity to police  officers who had indisputably
> relied on information obtained from other law
> enforcement officials, *when we concluded that they
> violated their duty to conduct further investigation.*

*Mendocino Environmental Center v. Mendocino County*, 192 F.3d
1283, 1293 n.16 (9th Cir. 1999) (emphasis added).  Thus, even if
Chief Ramsey did not have knowledge of Assistant Chief Newsham's
failure to give the dispersal order, it was patently
unreasonable for him to approve the arrest without asking
essential questions--the most essential being whether an order
to disperse had been given.  It is similarly unreasonable, in
view of *Dellums* and clearly established MPD policies, for the
Chief to accept Assistant Chief Newsham's assertions that there
was probable cause for arrest as to *every* person in the Park.

28

Quite simply, a police chief in Chief Ramsey's position could not reasonably assume, absent probing inquiry, that all 400 individuals in the Park had independently engaged in illegal behavior.  *See* Herold Depo. at 333-34, 335 (there was not probable cause to arrest entire crowd); Tr. 4/6/04 at 20-21 (no illegal activity was occurring in the Park); *see also Be Vier,* 806 F.2d at 127 ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.").[7]

Finally, plaintiffs argue that Chief Ramsey violated his duty to supervise the Assistant Chief and his subordinates. The most recent Circuit case on the issue of supervisorial liability, *International Action Center v. U.S.*, draws a sharp distinction between supervisorial liability for direct action and liability for inaction.  365 F.3d 20 (D.C. Cir. 2004). *International Action Center* makes clear that supervisorial liability cannot be grounded on a theory of "general inaction."

> A supervisor who merely fails to detect and prevent a subordinate's misconduct . . . cannot be liable for

---

[7] At the April 6, 2004, Motions Hearing, defense counsel relied heavily on Chief Ramsey's issuance of a post-arrest official reprimand to Assistant Chief Newsham--reprimanding Assistant Chief Newsham for "the failure to give warnings to disperse"--as evidence that Chief Ramsey did not approve the arrests.  However, the after-the-fact reprimand does not cure the failure to ask the questions that a reasonable police chief *on the scene* must ask--namely, if an order to disperse had been given.

> that misconduct.  The supervisor must know about the
> conduct and facilitate it, approve it, condone it, or
> turn a blind eye for fear of what they might see.

*Id*. at 28 (internal citation and quotation omitted).

Chief Ramsey's performance at Pershing Park is precisely the active participation capable of rendering a supervisor personally liable for constitutional violations.  At worst, Chief Ramsey knew the dispersal order had not been given and thus deliberately flaunted existing law and MPD policies; at best, he turned a "blind eye" to the situation and refused to ask the questions necessary to ascertain whether arrests were constitutionally permitted.  Chief Ramsey was actually *on the scene* before and when the arrests occurred, had the opportunity to confer with his subordinate, and approved the decision to order the arrests.  He is thus just as liable for the resulting constitutional violations as Assistant Chief Newsham.[8]  *See*

_____

[8] Plaintiffs further argue that in addition to direct participation in the arrests, Chief Ramsey can also be personally liable for his *ratification* of the unconstitutional mass arrests. Plaintiffs state that Ramsey ratified the arrests by (1) his direct participation; (2) his rejection of arrestees' complaints even as they sought to leave; (3) his express approval of the mass arrests at the September 27, 2002, press conference; (4) his comments in late September that he "offer[ed] no excuses, and no apologies" for the arrests and rated the MPD's actions as "A plus;" and (5) his April 29, 2003, testimony to the D.C. Council that the MPD does "a very good job dealing with" mass demonstrations. *See* Pls.' Opp. to Ramsey and Williams Mot. to Dismiss in 02-2283 at 20 (citing and quoting press articles). However, given that the Court concludes that Chief Ramsey

*Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987) ("in order to find a supervisory official personally liable in damages for the unconstitutional acts of his subordinate, it must be shown that he was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened."); *see also Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (supervisor liability under § 1983 is appropriate when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least *implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate*") (emphasis added).  Accordingly, for any or all of the reasons stated above, Chief Ramsey's motion for qualified immunity as to the Pershing Park arrests is denied.

---

destroyed his immunity for the arrest through *direct* participation, the Court need not reach this indirect participation issue.

3. *Mayor Williams's Immunity for Arrests in Pershing Park in Civil Action 02-2283*

Plaintiffs claim that Mayor Williams is also personally liable for the mass arrests based on a failure to instruct Chief Ramsey and Assistant Chief Newsham "not to engage in mass unconstitutional arrests," ratification of the arrests in media interviews following the arrest, and allowance of a custom or practice of using mass arrests to terminate protests.  Mayor Williams argues that he is entitled to summary judgment on all of plaintiffs' § 1983 claims; the thrust of his qualified immunity defense is that, even if plaintiffs did suffer a constitutional harm at the hands of the MPD, he cannot be held vicariously liable for his subordinates' actions.  In light of *International Action Center*, the Court agrees.

Plaintiffs argue that Mayor Williams "subjected plaintiffs to an ongoing period of incarceration when on September 27, 2002, he held a press conference to reap political benefit from the Chief's mass false arrests.  The Mayor, at that time, could have taken measures to enforce the U.S. Constitution, to intervene against the Chief, to cease the incarceration of the arrestees or to limit the damage done by demanding arrests cease and persons be released immediately."  *See* Pls.' Opp. to Ramsey and Williams Mot. to Dismiss in 02-2283 at 21.  Plaintiffs claim

32

that Mayor Williams ratified the mass arrests during the September 27th press conference, "at which he praised the execution of the mass arrests as a proper balance between open expression and public safety." *Id.* at 22.

In light of *International Action Center v. U.S.,* the case for Mayor Williams's personal liability is tenuous. First, the Mayor cannot be held liable for an *active* failure to supervise on these specific facts, as, unlike Chief Ramsey, he was not on the scene at the time of the arrest, was not consulted about the mass arrests before they occurred, and did not approve the arrests before they occurred. *See International Action Center,* 365 F.3d at 26-28 (recognizing that there is a difference between supervisorial liability for inaction and supervisorial liability for active participation).

As to Mayor Williams's liability for supervisorial inaction, plaintiffs allege that past protest-related mass arrests should have prompted the Mayor to take proactive steps to prevent future mass arrests. However, the bar for piercing the qualified immunity shield on a theory of inaction in the face of knowledge of past transgressions is high, as a "supervisor who merely fails to detect and prevent a subordinate's misconduct . . . cannot be liable for that misconduct." *International Action Center,* 365 F.3d at 28. As clearly stated in *International Action Center,*

such liability cannot simply be premised on a showing that the supervisor had "knowledge of past transgressions." *Id.* Rather, to defeat a supervisor's assertion of qualified immunity, plaintiffs must "link the likelihood of particular constitutional violations to any past transgressions," and also link "particular supervisors to past practices or any familiarity with them." *Id.* at 27. Thus, plaintiffs must establish either that (1) Mayor Williams authorized the allegedly unconstitutional mass arrests, or (2) Mayor Williams had reason to believe, prior to September 27, 2002, that Assistant Chief Newsham and Chief Ramsey would engage in unconstitutional arrests. This they have not done.

First, Chief Ramsey has made clear that he knew Mayor Williams *would not* authorize arrests without probable cause. Williams and Ramsey Statement of Material Facts in 02-2283 ¶ 64. Given that Mayor Williams was not on the scene of the arrests, and was not consulted prior to the arrests, any claims of mayoral authorization are defeated. As Mayor Williams argues, he is not kept apprised of the "complex and fluid details of mass demonstration policing efforts," and thus "does not possess the basis necessary to ratify unconstitutional practices." Ramsey and Williams Mot. to Dismiss in 02-2283 at 33. Absent evidence to the contrary, the Court accepts this representation.

Whether the Mayor's knowledge of a "history of past

transgressions" creates a duty to act proactively to prevent unconstitutional mass arrests is admittedly a closer question. Pls.' Supplemental Brief in 02-2283 at 10.  Plaintiffs state that IMF/World Bank protestors were "subjected to almost identical mass false arrests" in April 2000, and cite to the extensive press coverage of the 2000 arrests, and comments made by Mayor Williams after those arrests, as evidence that he was fully aware of this past practice.  Pls.' Response at 28-30 (alleging that the 2000 protestors, like the 2002 protestors, were arrested without prior notice to disperse, were prevented from leaving the protest area, and were held overnight); Pls.' Supplemental Brief in 02-2283 at 11-12.  Thus, plaintiffs conclude that the Mayor has "steadfastly chosen to not take effective action to prevent the continuation of this policy, practice or custom of which he approves."  Pls.' Supplemental Brief in 02-2283 at 14.

However, the central question is whether the Mayor's actual knowledge of these past practices established a sufficient link to the instant mass arrests so as to hold the Mayor liable for a failure to prevent his subordinates from repeating the mass arrest scenario.  Any personal liability cannot rest on the Mayor's knowledge of past events; plaintiffs also have to show that Mayor Williams could have, and failed to, take steps to prevent the Pershing Park arrests.

The record evidence demonstrates that at least minimal steps to ensure protests would be permitted were indeed taken. It is undisputed that during the weeks prior to September 27, 2002, Chief Ramsey held meetings with the Assistant Chiefs and instructed them that "arrests of demonstrators should be avoided if at all possible. His intent was to allow anyone who wanted to protest or demonstrate to do so even if it meant overlooking some minor violations of the law that did not seriously threaten public safety."  Ramsey Statement of Material Facts in 03-767  ¶¶ 21, 23.  There is record evidence of supplemental officer training, evidence that the Chief knew the Mayor would not permit unconstitutional arrests, and evidence of a declared policy to allow minor violations of the law in order to facilitate First Amendment expression.  That the Mayor's subordinates violated clearly established MPD policy and federal law does not remove the Mayor's personal liability shield, as it appears, based on pre-protest preparations, that the Mayor had reason to believe his subordinates would comply with federal law and MPD policies. *See International Action Center,* 365 F.3d at 28 (where supervisorial inaction is alleged plaintiffs must "establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates").

Finally, plaintiffs' claims that Mayor Williams ratified the

arrests by speaking approvingly of the MPD during a subsequent news conference also fall flat.  Mayor Williams persuasively argues it was not objectively unreasonable *at the time* for the Mayor to comment on the actions of the Police Department, and that public officials should not be precluded from public comment for fear of imputed personal liability.  Further, once allegations of wrongdoing came to light following September 27, 2002, Mayor Williams ordered an investigation of the Pershing Park arrests.  This resulted in the publication of a revised Mass Demonstration Manual in May 2003, and the issuance of an official reprimand to Assistant Chief Newsham.  Williams and Ramsey Statement of Material Facts in 02-2283 ¶¶ 59-61.

Accordingly, given that Mayor Williams did not actively participate in the arrests, and recognizing the high bar for supervisorial inaction liability established in *International Action Center*, the Court finds that Mayor Williams is not personally liable for the Pershing Park arrests.

**B. Immunity for Arrests at Vermont and K Streets in Civil Action 02-2283 and Civil Action 03-767**

Based on the forgoing discussion, the analysis as to the

arrests at Vermont and K Streets is considerably more brief.[9]
Assistant Chief Brian Jordan, who is not a named defendant, was
responsible for the area surrounding Vermont and K Streets.
Jordan Decl. ¶ 2; Williams and Ramsey Statement of Material Facts
in 02-2283 ¶ 53.

Simply stated, there is no record evidence that Chief Ramsey
was on the scene of Vermont and K Streets at the time of the
arrests, and the Court accepts Chief Ramsey's assertion, through
counsel, that Chief Ramsey was not present.   Tr. 4/6/04 at 39.
Further, unlike the arrests in Pershing Park, there is no record
evidence suggesting that Chief Ramsey in any way approved the
Vermont and K Streets arrests.   Given that Chief Ramsey did not
actively participate in the arrests, he could only be held
personally liable on a theory of failure to supervise Assistant
Chief Jordan.  As discussed *supra*, however, a "supervisor who
merely fails to detect and prevent a subordinate's misconduct . .
. cannot be liable for that misconduct."  *International Action
Center,* 365 F.3d at 28.   Chief Ramsey asserts, and it has not

---

[9] The Court has very little information regarding the arrests at
Vermont and K Streets, as the parties have devoted scant
resources to the issue.  Indeed, the Abbate plaintiffs do not
even mention the Vermont and K Street arrest in their Opposition
to Chief Ramsey's Motion for Summary Judgment; the Barham
plaintiffs devote two paragraphs to Chief Ramsey's potential
personal liability for those arrests.

been contradicted, that in the days leading up to the protests he repeatedly conferred with his command staff, "expressed his intent to allow anyone who wanted to protest or demonstrate to do so even if it meant that the MPD had to overlook some minor violations of the law," and instructed the command staff to avoid arrests of demonstrators "if at all possible."  Ramsey Decl. ¶¶ 4-10.   While this prior instruction to his subordinates does not save Chief Ramsey as to the Pershing Park arrests, as he actively participated in and approved the arrests, this prior instruction does protect Chief Ramsey from personal liability for supervisorial *inaction* as to Assistant Chief Jordan's actions at Vermont and K Streets.

Finally, the preceding discussion of Mayor Williams's liability for the Pershing Park arrests applies with equal force to his liability for the Vermont and K Streets arrests; Mayor Williams cannot be held personally liable on a supervisorial inaction theory for violations arising from the Vermont and K Streets arrests.

## C.  Conditions of Confinement/Excessive Force Claims in Civil Action 02-2283 and Civil Action 03-767

The first step in every qualified immunity analysis is to determine whether a constitutional violation has occurred.  The

Court finds that plaintiffs are unable to establish that defendants' actions, specifically the use of flexi-cuffs during plaintiffs' arrests, constituted excessive force, and thus concludes that no constitutional violation capable of destroying the qualified immunity shield occurred.

Two types of excessive force claims are at issue. *See* Tr. 4/6/04 at 98-99. First, the *Barham* plaintiffs assert excessive force allegations primarily as an element of their false arrest claims. *Id.* at 98. In other words, the *Barham* plaintiffs' excessive force claims are based on the alleged injury suffered as a result of the level of force used in effectuating an unlawful arrest. In contrast, the *Abbate* plaintiffs challenge the use of force during the arrests and the "practice of the so-called wrist to ankle handcuffing or flexi-cuffing which occurred for those people who were detained at the police academy . . . whether or not it is also an element of false arrest damages." *Id.* at 99. The *Abbate* plaintiffs allege that the level of force used during their post-arrest detention was excessive. *See id.* at 92, 98-99, 102-05. Under either concept of excessive force, plaintiffs cannot succeed.

1. *Use of Force During the Arrests*

In *Graham v. Connor*, the Supreme Court established "that *all* claims that law enforcement officers have used excessive

force . . . in the course of arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  490 U.S. 386, 395 (1989) (emphasis in original).  The *Graham* approach has been expressly adopted by the D.C. Circuit.  *See, e.g.*, *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1999); *DeGraff v. District of Columbia*, 120 F.3d 298, 301-02 (D.C. Cir. 1997).  However, whether a specific action during an arrest constitutes a "reasonable" use of force remains a murky question.

Determining the "reasonableness" or "excessiveness" of a specific level of force during an arrest requires "careful attention to the facts and circumstances of each particular case," with the ultimate question being "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 396-97. In conducting its analysis, the Court will look to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396 (emphasis added).

The reasonableness of the level of force employed must be judged, *ex ante*, from the perspective of the officer on the

scene, "rather than [through] the 20/20 vision of hindsight."
*Id.*  It is clear that "[n]ot every push or shove, even if it may
later seem unnecessary in the peace of a judge's chambers,
violates the Fourth Amendment."  *Id.* at 396 (internal citations
omitted).  Furthermore, any determination of "reasonableness"
must account for the "split-second judgments" often required in
law enforcement.  *Id.* at 397.

As a result, few bright line rules exist as to what
constitutes excessive force during an arrest.  In the present
case, the Court is asked to determine whether the MPD's use of
"flexi-cuffs" to restrain plaintiffs (and other arrestees) during
arrest amounted to excessive force.  The D.C. Circuit has never
addressed the question of when "flexi-cuffing" amounts to
excessive force, and little guidance is provided by the other
circuits.  Several circuits have recognized that applying
handcuffs too tightly *may* constitute excessive force.  *See, e.g.*,
*Bastien v. Goddard*, 279 F.3d 10 (1st Cir. 2002); *Kostrzewa v.
City of Troy*, 247 F.3d 633, 640 (6th Cir. 2001).  However, other
courts have held that handcuffing too tightly, without other
actions, does not amount to excessive force.  *See Rodriguez v.
Farrell*, 294 F.3d 1276 (11th Cir. 2002) (holding an officer's
refusal to adjust the handcuffs on a complaining suspect does not
necessarily constitute excessive force); *Glenn v. City of Tyler*,

242 F.3d 307 (5th Cir. 2001) (handcuffing alone is not excessive
force).

In sum, the guidelines necessary to decide whether the use
of handcuffs (or flexi-cuffs) during an arrest may constitute
excessive force remain undefined in the D.C. Circuit and
generally inconsistent across its sister circuits.  This lack of
clearly established law is relevant both to determining the
"reasonableness" of an officer's actions and whether the officer
is entitled to qualified immunity.  Plaintiffs have provided no
evidence to demonstrate the level of force utilized during their
arrestexcessive.  The arrestees were handcuffed in standard
fashion and transported to a makeshift holding facility at the
Police Academy.  *See* Tr. 4/6/04 at 101-05.  There have been no
allegations that the manner in which plaintiffs were handcuffed
at the time of arrest was unique or abnormally oppressive.

Accordingly, the Court finds that it is unlikely that the
use of flexi-cuffs during the arrest, without more, amounts to a
constitutional violation.  It is undoubtedly reasonable to
handcuff arrestees during a mass arrest, especially when they are
being transported via an unsecured bus to a holding facility.
Moreover, due to the lack of clearly established law in this
Circuit or other circuits, the Court cannot find that it would
"be clear to a reasonable officer that his conduct was unlawful

43

in the situation he confronted." *Groh v. Ramirez*, 124 S.Ct 1284, 1293 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Absent clearly established law, defendants cannot be held personally liable for the excessive force claims.

   *2. Use of Force During Detention*

   Plaintiffs argue that the use of flexi-cuffs during detention, cuffing one wrist to the opposite ankle, violated clearly established law prohibiting the use of excessive force. They argue that "handcuffing unresisting plaintiffs, who were already confined in the Police Academy Gymnasium, wrist to ankle for an extended period of time was . . . grossly excessive and injurious . . . ." Pls.' Opp. to Ramsey's Motion to Dismiss in 03-767 at 17. Plaintiffs cite *De Graff v. District of Columbia* as the "clearly established law" on the Fourth Amendment and excessive force, and relied heavily on this case at oral argument. In *DeGraff*, the Circuit reversed and remanded the lower court's decision that police officers who had handcuffed a woman, carried her horizontally for some distance, and then handcuffed her to a mailbox were immune from liability. Noting the limited record before the Court, but also warning that "it would be hard to justify their actions," the Court remanded for further development of the record. 120 F. 3d 298, 302 (D.C. Cir. 1997).

However, *De Graff* makes clear that "police officers will not be found to have used excessive force in violation of the Fourth Amendment if their actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 302 (noting force has been considered appropriate with an "evasive suspect," or "escaping prisoner" and when officers fear for their safety) (internal citation and quotation omitted). Here, the use of flexi-cuffs by officers facing a crowd of several hundred protestors is not analogous to handcuffing a woman, forcibly carrying her horizontally, and then cuffing her to a mailbox.

Further, the Supreme Court has noted that an excessive force due process analysis turns on whether the force used amounts to "punishment:"

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].

*Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979) (internal citation and quotation omitted). At oral argument on April 6, 2004, plaintiffs argued that it was not simply the use of flexi-cuffs,

but the period of time and the manner in which they were used (cuffing wrist to opposite ankle) that rendered the use excessive.  They further argued that, given that the arrestees were in a confined area--an area designated for people who were *cooperating* with police--and not appearing to pose a risk of violence or flight, the use of flexi-cuffs was not warranted.

Defendants Ramsey and Williams counter that "the use of flexi-cuffs was reasonably related to the legitimate government interest of maintaining the safety of the arrestees and the MPD processing personnel," and that a reasonable officer in the same position would have deemed the use of flexi-cuffs necessary, or at the least not constitutionally impermissible.  *See* Ramsey Reply Mem. in 03-767 at 15.  Defendants argue that the flexi-cuff restraints were used to (1) protect the safety of the detainees, officers, and guards, (2) prevent inappropriate "fraternization"[10] among the detainees, (3) prevent damage to

---

[10] At oral argument, defendants asserted the use of flexi-cuffs met a need to prevent "fraternization" or "mass fornication" among the arrestees.  As the Court made abundantly clear during oral argument, this rationale is flatly ridiculous, and the Court lends it no credit.  Moreover, the Court sharply emphasizes that it does *not* accept this rationale as legitimate or as justifying the use of flexi-cuffs.  *See* Tr. 6/14/04 at 16-21.  Indeed, had this been the only rationale offered for the use of flexi-cuffs, the Court would find a constitutional violation had occurred, and would likely conclude that defendants face personal liability for that violation.  Defendants have saved themselves, however, by wisely choosing to rely more heavily on arguments that flexi-cuffs were needed for protection and to prevent arrestee escape

property, and (4) prevent escape (given that the detainees were held in an open gymnasium rather than secured cells).  *See* Tr. 4/6/04 at 118-25.

The use of flexi-cuffs, without more, does not, under the circumstances of mass arrest, reach the level of excessive force. Here, the officers had a legitimate need to control a large group of people.  "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment."  *Bell,* 441 U.S. at 538-39.  Putting aside the absurd fraternization/fornication argument, the use of flexi-cuff restraints is reasonably likely to serve the stated goals. Indeed, *Bell* specifically concludes that the government has "legitimate interests that stem from its need to manage the facility in which the individual is detained," including the need to "maintain security and order at the institution."  *Bell*, 441 U.S. at 540.

Defendants Ramsey and Williams have supported the decision to use flexi-cuffs, and the Court concludes that reasonable officials in the same position could have made the same decision. Accordingly, the Court finds that Chief Ramsey and Mayor Williams are not personally liable on the excessive force claims.

from an unsecured area.

**D.  Length of Detention Claims in Civil Action 02-2283
and Civil Action 03-767 as to Defendant Ramsey and
Defendant Williams**

Both the Abbate and Barham plaintiffs assert that their
rights to due process and equal protection were violated by
extended detention and the unavailability of citation and/or post
and trial release.  More specifically, the Abbate plaintiffs
argue that Chief Ramsey "had a clearly established duty to
release Plaintiffs from custody because he knew, while the
plaintiffs were waiting to be loaded onto busses at Pershing
Park, that they had been falsely arrested."  Pls.' Opp. to Def.
Ramsey's Mot. for Summ. J. in 03-767 at 18.   The Barham
plaintiffs center their extended detention claim on allegations
that "persons caught in targeted mass political sweeps" are
denied access to citation release and post and trial release.
The Barham plaintiffs argue that the post and trial option
"allows an arrestee to be quickly released from jail or custody
by posting collateral and receiving a trial date on which to
challenge the legality of the arrest," whereas the post and
forfeit option allows an arrestee early release but does not
allow her the opportunity to challenge the legality of the
arrest.  Am. Compl. in 02-2283 ¶ 10.   The Barham plaintiffs

48

conclude that this amounts to "disparate treatment"--apparently
on a theory that non-protestors have access to citation and/or
post and trial release--and denies protestors equal protection
under the law.  Mayor Williams and Chief Ramsey claim they are
immune from personal liability on plaintiffs' extended detention
claims.

As an initial matter, the Abbate plaintiffs' mere
contention that Chief Ramsey "knew" the arrests were invalid is
not enough to defeat Chief Ramsey's motion for summary judgment
on the extended detention claims.  While the Court agrees that
the arrest itself violated clearly established constitutional
rights, and that Chief Ramsey faces personal liability for that
arrest, this does not automatically compel the conclusion that
Chief Ramsey later violated a constitutional duty to release the
arrestees.

Rather, the analysis of the constitutionality of the arrest
and the analysis of whether a later duty to release arose are
distinct.  A duty to release only arises where an officer
"actually does ascertain beyond reasonable doubt that one who has
been . . . arrested" should not have been due to lack of
probable cause.  See McConney v. City of Houston, 863 F.2d 1180,
1185 (5th Cir. 1989).  Moreover, an officer is not required to
"reassess the initial probable cause finding at every change in

circumstances or protestation of the arrestee."  *Id.*  There is no record evidence that new information came to Chief Ramsey's attention following the arrests that alerted him to a need to release the arrestees, nor is there record evidence that Chief Ramsey at some point determined that the arrests were made without probable cause.  Indeed, defendants' defense *still* relies on the theory that the allegedly unlawful acts committed by the protestors before entering the Park established probable cause.

Accordingly, it appears to the Court that Chief Ramsey continually maintained the belief that the arrests were supported by probable cause, and thus no constitutional duty to release arose.  Absent a constitutional violation, Chief Ramsey cannot face personal liability.

The Barham plaintiffs' claims as to the length of detention, premised on an equal protection theory, fare no better.  First, Chief Ramsey and the Mayor persuasively argue, supported by the record, that the MPD did attempt to make citation release available.  *See* Williams and Ramsey Statement of Material Facts in 02-2283 ¶¶ 43-44 (noting that defendants arranged with the D.C. Superior Court for arrestees to be permitted access to citation release, despite the fact that citation release is typically not available when the Court is in session).  The fact that citation release was not ultimately available, or was

delayed for many arrestees, was the result of unintended technological failures.  Indeed, Chief Ramsey notes that when he was notified of the failure of the expedited procedures he dispatched additional resources to cure the problem.  Mot. for Summ. J. in 03-767 at 30.  Accordingly, the unavailability of citation release does not appear to trigger a constitutional violation, but rather amounts to negligence at most.  It is well settled that mere negligence cannot lead to personal liability for an official.  *See Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Finally, plaintiffs have cited no authority standing for the proposition that the unavailability of a post and trial release option amounts to a constitutional violation.[11]  Moreover, plaintiffs, while alleging disparate treatment, have not demonstrated that other groups of arrestees are routinely afforded access to post and trial release; thus, the Court does not have a comparative group against which to gauge the treatment of plaintiffs, and cannot conclude that plaintiffs were denied equal protection of the law.

Given that the unavailability of citation release was due to

---

[11] The Court also notes that the Supreme Court has established that the government may detain an arrestee for up to 48 hours prior to a probable cause determination.  *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  Here, plaintiffs allege a 30 hour detention.

(at most) negligence, and in the absence of evidence that the
plaintiffs were treated differently than other groups of
arrestees, the Court cannot conclude that a constitutional
violation occurred.  Accordingly, Mayor Williams and Chief Ramsey
cannot be held personally liable on these claims.

**E. Deprivation of Property Claims in Civil Action 02-
2283 and Civil Action 03-767**

The Abbate plaintiffs have conceded their deprivation of
property claims for purposes of the immunity motions.  *See* Tr.
4/6/04 at 46.  Moreover, the Court recently granted defendants'
motion for summary judgment on the Abbate plaintiffs' deprivation
of property without due process claims.  *See* September 15, 2004,
Memorandum Opinion and Order.  Neither the defendants asserting
qualified immunity in the *Barham* action nor the Barham plaintiffs
have argued deprivation of property claims in the qualified
immunity context; accordingly, the Court does not engage in a
qualified immunity analysis as to any potential deprivation of
property claims.

**VI. CONCLUSION**

For the reasons stated above, the Court finds that Chief
Ramsey and Assistant Chief Newsham are not protected by

52

assertions of qualified immunity for the mass arrest effectuated without a prior order to disperse at Pershing Park.  Mayor Williams, however, is protected from personal liability for the Pershing Park arrests by principles of qualified immunity.  The Court further finds that Mayor Williams and Chief Ramsey are shielded from personal liability as to the claims related to the Vermont and K arrests, the claims regarding length of detention and use of excessive force, and the claims regarding deprivation of personal property without due process.  An appropriate order accompanies this opinion.


**Signed: EMMET G. SULLIVAN**
**UNITED STATES DISTRICT JUDGE**
**September 24, 2004**